————o————

No. 4427.

(Court of Appeal, Parish of Orleans.)

## DR. THOMAS S. ADAMS VS. LIVERPOOL & LONDON & GLOBE INSURANCE COMPANY.

1. Where the defense in a suit on a contract of fire insurance is that of fraudulent fire, the fact that the assured himself set or caused to be set the fire which destroyed the property, may be established by presumptive, as well as direct evidence.
2. The law, in cases of this instant character does not exact that the facts of fraudulent fire must be as fully proven as an indictment for arson.
3. The facts from which an inference or presumption is drawn must not only be established in evidence, but the inference, or presumption to which the proven facts give rise, must be strong and almost inevitable, or, in the language of the Code, "weighty, precise and consistent."
4. Nor must the known facts established in evidence be such as are susceptible of application to other circumstances, conditions and motives than those which it is sought to establish.
5. Where the known facts may reasonably suppose an unknown fact to be strictly consistent with honesty and fair dealing, and where there is another hypothesis involving honesty, the rule is, unless the scale clearly predominates in favor of the latter, to adopt that inference or presumption which is in favor of innocence.

Appeal from Civil District Court, Division B.

W. S. Frazee, Woodville & Woodville, for Plaintiff and Appellee.

H. H. Hall & Monroe, and Luzenberg, for Defendant and Appellant.

MOORE, J. This was a suit on a policy of fire insurance.

The defense is that the fire was set, or caused to be set, fraudulently by the plaintiff.

There was judgment in favor of plaintiff for the amount sued for and defendant appeals.

The fire occurred on the night of Sunday, Aug. 6, 1905, and that it was the result of incendiarism is not and cannot be denied.

The building in which the fire occurred was occupied by four different tenants. Peter Copeland occupied the first or ground door; the plaintiff the second floor, and C. A. Williamson and Philip McGraw the third floor.

It is shown by the Fire Marshall, who made his inspection the day after the fire, that the fire originated on the third floor. He found that the flooring therein had been cut for a distance of about five feet and that a number of auger holes had been bored through the room below, one of the suite occupied by the plaintiff and used as his study or private office. Between the joists inflammable materials—paper saturated with oil—had been inserted. The flooring was much burnt, and from a large hole made therein, fire had fallen below to the said study or private office. On the side of the wall on the third floor and a few feet from where this large hole was cut, there stood a small cabinet used by Williamson, and adjoining his bedroom in front. This wall and cabinet and a quantity of paper scattered around was so saturated with oil that the latter had gone through the woodwork under the panel of the room into the study below.

The wall had been broken and pieces of paper, wood and pine chips had been stuck in between the laths

On going down to the floor below, that occupied by plaintiff, and entering the study or office of plaintiff, the Fire Marshall found a desk upon which there was a large barrel, the end of which was covered with a sack, and in which was found small pieces of boxes saturated with oil. In the drawers of the desk were a quantity of apparently freshly-laundried towels, and under the desk were empty boxes, all likewise saturated.

The side wall here, as on the floor above, was broken, and small oil-soaked kindling wood inserted in the opening. No evidences of incendiarism were discovered in the reception, operating, consulting or other rooms occupied by the plaintiff. The Fire Marshall also testified that his impression was that the

fire originated on the third floor and had fallen down to the study, or private office of plaintiff below. The beginning of the work, he is satisfied, was on the third door.

The third floor, besides for the purposes of their business, were, or rather had been, used by them as sleeping apartments for themselves and, their respective families. McGraw, however, had sent his wife away six days prior to the fire to Covington, leaving his belongings in the building; and Williamson had last lodged there on Wednesday preceding the fire, also leaving his furniture, etc., in the building. Plaintiff's lodging had always been and was at the Commercial Hotel. Plaintiff, McGraw, Williamson and Copeland were all in the city on the night of the fire. McGraw having returned from Covington that same evening, and all were in the neighborhood of or in the premises some time during the day of the night on which the fire occurred. except McGraw, who, as stated, returned from Covington on that Sunday evening. He was in the neighborhood, however, that evening.

The fire was discovered about midnight. The plaintiff, who is a physician, a native of Louisiana, having been born in the parish of East Feliciana, and a resident of the city of New Orleans for the past twenty years, acquired on the 30th day of March, 1905, by purchase from the Electro-Chemic Institute, then established, and continued by the plaintiff at the same place where the fire occurred, its entire plant consisting of, (1st), all its medical and surgical instruments, electrical machines and appliances, and furniture and fixtures of every description, and, (2d), its stock of drugs, medicines, chemicals, etc., for the sum of two thousand dollars cash.

The property at this time was insured by the Electro-Chemic Institute against fire in the defendant company under a "blanket policy," which covered the first above named articles, in the sum of $1700.00, and the second above named articles, in the sum of $300.00. This policy was, with the consent and approval of the defendant company, assigned and transferred to plaintiff.

Subsequent to his purchase plaintiff added additional instruments, appliances and appurtenances to those purchased, refitted and re-embelished the rooms and restocked the drugs, chemicals, etc. No insurance covered these drugs, save the insurance transferred and assigned as aforesaid, and no additional insurance was obtained or applied for.

It is shown by plaintiff's testimony, corroborated by a witness for the defendant, and contradicted by no one, that at this place and with the apparatus and outfit stated, the plaintiff's practice yielded him a revenue of from $500 to $700 per month. It is equally as conclusively established that the property covered by the policy was, immediately prior to the fire, worth fully $3500.

It is shown by the testimony of Dr. W. W. Payne, a physician residing in Meridian, in the State of Mississippi, and whose testimony was taken by commission, that he visited New Orleans about the 6th June, 1905, and then became acquainted with the plaintiff; that he visited the plaintiff's establishment, and after carefully considering the contents and property, "he then and there made an offer to the physician in charge, an elderly gentleman, Dr. Adams being absent, of the sum of $2000 for a half interest in the Institute; that immediately after his return home, "perhaps the next day, I (he) wrote to Dr. Adams confirming my (his) offer of $2000, and fully intended paying the amount in cash, if accepted by Dr. Adams." Dr. Adams answered that he would not take $2000, but would take $3000.

Continuing his testimony, Dr. Payne says:

"I am clearly of the opinion, after careful investigation of the stock, that the property was worth $2000, *that is, the half interest, aside from the good will,* and it was my purpose to make an offer of $2500 therefor, and would have done so, had it not been for the interruption caused by the quarantine of yellow fever advent into the City of New Orleans. I had no personal acquaintance with Dr. Adams; had never seen him until the day I met him in New Orleans investigating his Institute; but having just returned from New York attending the Electrical Course, and desiring to invest in that line of practice, I was extremely anxious to invest in that line of business, and was satisfied with the outfit of Dr. Adams' Institute, *and without any solicitation on his part.*"

On cross-examination he says:

"I made the offer of $2000 for a half-interest in the Institute, predicated upon my idea of the value of the outfit, instruments and furnishing of the business."

Asked "whether the offer was based on the good will of the business, rather than the stock in trade and merchandise in the premises," he answered:

"No, sir; it was based solely upon the stock in trade, of merchandise in the premises. It contained and I thought such outfit as I desired to engage in the business. I have since established a similar business in Meridian, at a cost of $3200. I have no knowledge of the influence of the Institute or of the value of the good will thereof, but the Institute had been recommended to me, and I sought an investigation, with the view of purchasing an interest in the same."

Besides this, Dr. L. D. S. Gaster, of this city, who was engaged in a similar practice, had, just prior to the fire, under favorable consideration a proposition of co-partnership with the plaintiff, as the plaintiff testified that he was in need of help, as he had a little more practice than he could attend to himself. "I wanted someone interested to look after the parties in the office when I was out." So he testified. His help then were on salary. Dr. Gaster was to pay, as he understood it, $2000 cash for a half interest, and as Dr. Adams understood it, $3000 for such interest. In addition to this, Dr. Gaster was to bring in all his equipment and his clientel. The fire defeated the consummation of the transaction.

• An itemized and detailed inventory of the property actually lost and destroyed was prepared by Dr. Adams, with the assistance of Dr. Gaster, in fixing values, and duly submitted to defendant, with proof of loss, and it is shown thereby that the actual loss is $2796, distributed as follows: On the items first above enumerated, $2306, and on the items secondly above enumerated, $490, and these values are fully sustained by the testimony on the trial hereof by both these parties.

It is contended by the learned counsel for defendant that we must infer or presume from the facts developed that the plaintiff set, or caused to be set, the fire which destroyed the property, and that this inference or presumption results from the proof: First, That no one but plaintiff had any motive to set fire to the property ; and, second, that "plaintiff had deliberately and repeatedly made false statements in connection with the charge;" third, that "there was no one but plaintiff in the building while the extensive preparations for the fire were being made, and no one but the plaintiff had access to the building," and, fourth, that "the testimony of plaintiff's witnesses are false."

305

We will consider these propositions in their inverse order.

Besides the plaintiff himself no one testified on his behalf but Louis Gonzales, the elevator boy of the Commercial Hotel, Dr. Gaster, H. W. Brodnax and Dr. Payne.

Dr. Payne testified only as to his efforts to purchase one-half interest in the property and as to his estimate of its value. Dr. Gaster's testimony was as to his negotiations with the plaintiff for the purpose of forming a copartnership with him; his assisting in the preparation of the inventory, and as to his appreciation of the value of the property lost. Brodnax's testimony was to the effect that he had prepared a dose of medicine in his drug store for the plaintiff about 10 o'clock of the night of the fire, the plaintiff complaining of cramps. The elevator boy testifies that he took Dr. Adams up to his room by the elevator about 11 o'clock, or a little later than that.

No attempt was made to contradict the testimony of either Gaster, Payne or Brodnax in any particular, save and except as to the value of the instruments lost. This the defendant sought to do by one witness, a Dr. Clarke, a manufacturer of osteopathic appliances and surgical instruments.

His estimate of the value of the instruments alone at the time of the fire is $1268.80. He admits that he took no account of "furniture and fixtures of every description, useful and ornamental, including wooden partitions, counters, shelving, printed books, typewriter, etc., which the policy covers under the indemnity of $1700, nor of "the stock of drugs, chemicals, stationery, boxes, bottles and labels" covered by the $300 indemnity clause.

The elevator boy's testimony is contradicted by the Fire Marshal, who testified that the boy Gonzales had stated to him on the Thursday or Friday following the day of the fire that " Dr. Adams had not appeared at the hotel during the entire night." Gonzales, however, says that his instructions from the manager of the hotel is not to give any information to persons not connected with the hotel as to who is in or out, or who goes up or down the elevator. In this he is not contradicted by the hotel clerk, who testified for defendant, nor is the fact shown by any of the hotel people or by any one else that the plaintiff did not occupy his bed in the hotel on the night of the fire.

The plaintiff testifies that he did and was asleep when the fire occurred.

Nor is the plaintiff's testimony shown to be false in any material point, nor is there any material conflict between his statements made under oath at the different examinations. If the plaintiff has testified falsely as to the value of the property destroyed, then so have Dr. Gaster and Payne, and it would be so only because more credence is to be given to the testimony of Dr. Clarke than to that of the others. The lower Judge believed the plaintiff and his witnesses in this particular and we see no reason why we should not do so also.

As an example of plaintiff's contradictory statements defendant's brief points out that plaintiff in his examination before the Fire Marshal, on the 17th October, 1905, had stated "that after the fire he picked up the small change which was in the stamp drawer," whereas, on the 17th November, 1905, when examined in the office of the attorney for defendant, and he was asked "if he had had a little change left and found same," he answered, "there were some stamps, I think;" and as an example of his false swearing, his testimony to the effect that 'the barrel (found on the desk, as stated *supra*) I cannot account for; there was no barrel on the premises," whereas, plaintiff's porter, testifying for defendant, says, "the barrel was kept in the coal room; I had not seen it for three months. After the bottom broke out I put a piece of sack on it." These are not sufficiently material, whether considered alone or in connection with other facts, to justify the conclusion that the plaintiff's testimony is false.

The contention "that there was no one but plaintiff in the building while the extensive preparations for the fire were being made, and no one but plaintiff had access to the building," is not sustained by the record.

Both Williamson and plaintiff were in the building on the day of the fire up to about 1 o'clock p. m., plaintiff returning at about 3 o'clock p. m., and remaining there about half an hour; and Copeland visited the building that evening about dark. None of them heard or saw anything amiss and none of them returned until after the fire.

The preparations for the fire must have been made during the early part of the night, and there is no more reason, so far as the facts of the record show, to charge that the preparation for the fire was made when no one but the plaintiff was in the build-

ing, than to charge that it was made when any one of the others were in the building. Nor is it a fact that no one but the plaintiff had access to the building. Plaintiff, Williamson and McGraw had equal access to both floors, and all, including Copeland, had access to the building.

So far as concerns the contention "that no one but plaintiff had any motive to set fire to the property," the evidence not only fails to sustain this, but on the contrary, it does show the very opposite. So far as we are advised by the record, plaintiff, of all four tenants, even including the owner of the building, would have been the only person who could have suffered from a fire. There is not a scintilla of evidence in the record as to the value of the building and the amount of insurance thereon, nor as to the value of the property belonging to either Copeland, Williamson or McGraw and the amount of insurance covering same, nor did any of them testify in the cause on its trial except the latter. There is some evidence to the effect that Williamson's and McGraw's losses were small, but the smallness of the loss was owing to the fact that the fire did not consume all their belongings.

The test is, not what their loss *was,* as the fire did little, if any damage to their property, but what it *would have been,* if, like the plaintiff's property, theirs' had been consumed.

What was the value of their property?

For what amount was it insured?

On these points the record is silent, and until satisfactory answers are given to these questions by all the tenants, it may not be justly said that it is shown that they could not have been benefited by the fire.

On the other hand, the value of plaintiff's property—it being nearly double the amount for which it was insured—the loss of his practice, temporarily, at least, he having at the time of the fire 152 patients on his list, and the revenue which he derived therefrom, all repel the suggestion that he could possibly be the author of the fire.

It may not be denied that the defendant may sustain its defense by circumstantial evidence, and that the fact that the insured himself set fire to the premises insured are not to be fully proven as on an indictment for arson (although on the latter point there are in this State at least two decisions of the Supreme Court to the contrary, 12 La. 341 and 17 A. 138), but it is equally undeniable that not only must the fact from which the inference or

308

presumption is drawn be established in evidence, but the inference or presumption to which these proven facts give rise must be strong and almost inevitable, or, in the language of the Code, be "weighty, precise and consistent." C. C. 2288.

As said, the Court in Bach vs. Cohn, 1 A., at p. 103: "The known fact on which the presumption reposes must draw with it the unknown fact, as an almost necessary consequence. The presumption must be precise, and not susceptible of application to other circumstances than that which it is sought to establish." So also in Goodwin vs. Pritchard, 10 A., at p. 251, it is said "an inference should be clear, cogent and convincing."

There is also another principle, well established in the law of evidence, to the effect that where, under the facts shown, we may reasonably suppose an unknown fact to be entirely consistent with honesty and fair-dealing, and where there is another hypothesis involving dishonesty, courts are bound, unless the scale clearly preponderates in favor of the latter, to adopt that inference or presumption which is in favor of innocence. Greenwood vs. Lowe, 7 A., at p. 199; Bank of Louisiana vs. Briscoe, 3 A. 157; Macarty vs. Mandeville, 3 A. 239, in which was involved the status of man, woman and their offspring, "the histories of both their lives, their habits, their pursuits, as well as their pecuniary means," and in Suc. Jenkins, 5 A. 682, where it was held "that the violation of a law is not to be presumed."

Apply these principles to the case at bar, and the result is that the facts established in evidence here and on which it is sought to rest the presumption that plaintiff was guilty of the charge alleged, does not draw with it, as a necessary consequence, such an inference.

Neither does this presumption result from considerations of weight, precision and consistency; nor are the known facts such as are not susceptible of application to other circumstances than those which it is sought to establish; on the contrary, they are reasonably consistent with honesty and fair dealing and innocence.

At the very utmost, defendant has done no more than to raise the suspicion of guilt against plaintiff. But a mere suspicion, however, is not enough to annul the policy and defeat the claim. 8 R. 442; 10 La. 179; 32 F. R., 47; 4 F. R., 59.

There is no error in the judgment, and it is affirmed.